Thank you, Your Honor. For the record, my name is Tim Becker. I'm from the law firm of Johnson Becker in St. Paul, Minnesota. I appear today on behalf of the Plaintiff Executive Committee and Gina Adams et al. As the court is aware, there are two overarching issues in this case, the first being preemption, the second being Dawbert. I'm going to discuss preemption first and then Dawbert. Taken collectively, Wyeth v. Levine and Merck v. Albrecht identify three elements that a defendant must establish in order to justify a preemption offense. Those are the existence of newly acquired information, second, whether there's clear evidence that the defendant fully informed the FDA, and third, whether or not the FDA, in fact, acted within its congressionally delegated authority. But while those elements seem rather simple and straightforward, neither Wyeth nor Albrecht have proof with respect to the first element in particular. And equally important, what is the quantum of proof required in order to defeat or justify the defense? However, while that is not definitively resolved, Albrecht sets out two points that I think are important in evaluating this issue. First, the Supreme Court reiterated that 21 U.S.C. section 201.57c, which is the regulatory framework which governs labeling, includes both section 5 and section 6 labels. In other words, it includes a section 5 label which establishes a causal relationship or causeless between the risk and the drug, and second, it includes the labeling that governs some basis for a proposed warning. Second, the Supreme Court confirmed, as it did in Albrecht, as it did in Wyeth, that the defendant or the manufacturer is responsible for ultimately vindicating the defense as well as its label. And that is likely because preemption is an affirmative defense. Notwithstanding this guidance, the Supreme Court, or sorry, the District Court rejected Albrecht and ultimately concluded at pages 22 and 24 of its order, that it is the plaintiff who holds the burden of establishing that the newly acquired information in fact establishes a causal association. In justifying this, the defendant cites to a series of cases, largely arising from Rule 12, that reach a similar conclusion. That makes sense, however, because in a Rule 12 context, under the Supreme Court's guidance in Iqbal and Twombly, a plaintiff is required to establish that a claim is in fact plausible. So in other words, it makes sense that a plaintiff would in fact have to plead that there is some existence of newly acquired information capable of establishing a causal association. But in the loan case that dealt with the context or the concept of newly acquired information in a summary judgment context, while the Fourth Circuit affirmed the dismissal of a claimant or preemption basis, it specifically noted, quote, if the record revealed the company reached conclusion about risks of a different type or risks of greater severity or frequency, but either elected not to publish or publish something different in bad faith, the unpublished conclusion might indeed qualify as newly acquired information. What does this mean? Well, we think, Your Honors, taken collectively, it means the following. The plaintiff holds a burden of production. In other words, the plaintiff is required to establish what in fact is the alleged newly acquired information. At that point, the burden shifts to the defendant to establish that the newly acquired information is not capable of establishing a causal association. And here, Novo failed to do that. Plaintiffs identified two forms of newly acquired information in the context of this case. The first was the Humedica study and subsequent representations before the series of non-clinical data. With respect to Humedica, as briefly discussed in the papers, Humedica was a massive epidemiological study evidencing some 200,000 people where Novo was effectively trying to evaluate what the incidence rates of pancreatic cancer was for patients anticipated to use Victoza. The results came back that the incidence rates of anticipated to use Victoza were half that versus people who actually used Victoza. In other words, in Leder itself, the primary clinical trial in this case, there was evidence that two times as many people versus the incidence rates experienced pancreatic cancer. That's particularly important because the placebo group did in fact mirror the incidence rates of the placebo group in Leder. The district court ultimately rejected this, ultimately rejected Humedica, not so much because it was not newly acquired information, but specifically concluded that the plaintiff had to then establish that that newly acquired information was capable of establishing a causal association. That holding was an error. Similarly, the non-clinical trial data, it was uncontested that it was not disclosed to FDA. Again, the district court put upon plaintiff the obligation to establish that the burden rested with it to prove a causal association. Ultimately, the reason why the district court erred is this. Once the plaintiff establishes newly acquired information, which we did in this case vis-a-vis a massive epidemiological study that was never disclosed, as well as the non-clinical data, which evidenced incidence of potential pancreatic cancer, the burden then shifts to NOVO to establish that, in fact, that's not capable of causing a causal association. Here, NOVO provided no evidence to the contrary of that. There was no expert report by NOVO that implicated or evaluated the Humedica study or the non-clinical trial data, and there was no evidence that, in fact, that those two studies were not capable of providing some basis to establish a relationship between the drug and harm. Turning to fully informed, the case law is very clear. Fully informed means just that. A manufacturer must fully inform the FDA of the newly acquired information else its preemption defense fails. With respect to the non-clinical trial data, there's no dispute and there's no evidence that this data was ever disclosed to FDA. As the Third Circuit said in Ray of Andia, the manufacturer is not the arbiter of what data gets disclosed to FDA and what does not, yet that is precisely what the district court held here, relying on testimony by NOVO executives and by NOVO experts that said that the data was not particularly relevant. Similarly, as we noted before, while the district court did not conclude that the Humedica data was not newly acquired information, it ultimately concluded that that information was, in fact, disclosed to FDA, but the record doesn't support that. Specifically, while the study appears on clinicaltrial.gov, NOVO never supplied that study directly to FDA. Instead, what NOVO did was publish it on its website, but in order to get to that website, nine separate clicks have to be conducted to get to the actual study, meaning FDA would have had to somehow know that A, the website existed, and B, how to actually navigate its way to the website. In evaluating this exact issue, the Taxotere Court, and this is set forth in the brief, specifically said it's not enough for the defendant just to supply information to FDA, which NOVO failed to do here. The defendant has to go one step further. Specifically, the defendant has to evaluate the information for the FDA and supply it to FDA so that they can make an informed decision. NOVO never did that here. And finally, there's no evidence that FDA acted within its congressionally delegated authority. And here, I think this court's decision, Hardiman, is directly to the standpoint. In Hardiman, as this court knows, it declined to find agency action where EPA specifically told registrants not to publish a warning related to cancer in the state of California. Ultimately, this court concluded, notwithstanding the fact that EPA had studied the issue, and notwithstanding the fact that EPA had issued a direct mandate, that that did not rise to the level of fully informed. In response, taking that guidance, NOVO specifically argues, or effectively argues, that in light of the FDA's action with respect to its article in EGAN, and also the citizen petition, that FDA has in fact acted. But as this court in Hardiman noted, informal agency action, like a peer-reviewed medical literature, or like a denial of a citizen's petition, is not the type of specific regulatory action that is delegated by Congress. That's particularly true given the fact the citizen's petition dealt with the issue of recall, and didn't even address the claims about a section 5 or section 6 warning. So taken collectively, it is a plaintiff's view that defendant has not established a defense for preemption, and this court ought to reverse. Turning to Dawbert, usually I go through prepared remarks, but as the court is aware, there is a considerable weight of evidence and a considerable volume record. I'm prepared to march ahead with those prepared remarks, unless the court has specific questions about any of the experts related to the Dawbert motions or issues that it has of concern. So turning to the issue of Dawbert, there were three groups of experts in play. The first was the biostatisticians, the second was the mechanism expert, and the third was Dr. Gale. I'm going to try to cover this in five minutes and reserve three minutes for rebuttal. With respect to the biostatisticians, the fundamental problem is this court is aware with respect to Dawbert, while the district court is afforded wide discretion with respect to its evidentiary findings, those evidentiary findings may be discarded where they are manifestly wrong or where the court misapplies the law. Because I don't want to cut into your time on what else you might want to say, but to cut to the chase, if you don't have Dr. Gale, what is the causation evidence? Well, we agree with the defendant, Your Honor, that if Dr. Gale is not, on this point, Dr. Gale is not allowed to testify that there is no expert to provide a general causation opinion because, as we conceded in our papers below and before this court, both the biostatisticians and the mechanism doctors are essentially set-up doctors. They're here to provide the basis for which, in part, Dr. Gale reaches his opinion. So maybe it makes some sense if I turn to Dr. Gale. I think it would because that's really the central issue here on review on abuse of discretion on the exclusion. Right. So a couple of points on Dr. Gale, and then I'll reserve some time for rebuttal. Ultimately, if you assume that the biostatisticians are capable of evading Daubert, largely because they had a sound methodology, and if you assume that Dr. Brown is capable of Daubert because he supplied a viable biological pathway as well as a mechanism, it means the following. A 50-year oncologist who is world-renowned, relying in part on his own work that evaluated 10 separate factors, weighing those various factors by using his clinical judgment, along with a biostatistician establishing an increased hazard and a mechanism expert establishing a viable pathway, reached a conclusion that it is more likely than not that lyriglutide is capable of causing pancreatic cancer. I think you have to judge that against the backdrop of this court's opinion in Wendell. As you know, in Wendell, this court allowed a very similar expert who was world-renowned in his field, highly qualified, to evade Daubert based on little more than a series of peer-reviewed articles. Here, comparatively, Dr. Gale relied on mechanism, biostatisticians establishing a hazard ratio, as well as his own independent evaluation. So the defendants in response raised three primary arguments. The first is he failed to conduct any review following the remand from this court in studies that he ostensibly should have looked at. The problem with that argument is that of the clinical studies that they require him to review or ask that he review, none of those involve lyriglutide. As we noted in our papers, lyriglutide, a point that the defendant itself concedes, is chemically and fundamentally different than other GLP-1s. They are not monolithic or universal. In fact, as the court noted in Rezolov, when a plaintiff endeavors to establish causation vis-a-vis a class-wide effect, that type of an argument is often disfavored. Second, the meta-analysis that the defendant claims that was not reviewed largely implicates leader, which Dr. Gale specifically testified he spoke with Dr. Madigan about, as well as reviewed Dr. Madigan. So in other words, there wasn't anything really for him to review post-2015 with the exception of leader, which he did. Second defendants criticized Dr. Gale claiming that his work is too subjective, but that's not true either. As we've just talked about, his report identifies 10 specific factors, which he evaluated, he relied on the biostatisticians, he relied on mechanism, and he ultimately used his clinical judgment to reach an opinion. That is Wendell and then some. When the district court concluded that the record contained no information to explain the criteria that Dr. Gale used, how do you respond to that? Well, and I will try and locate this exact quote, which is in the brief. There was a specific passage, your honor, that Dr. Gale was asked about this type of thing and specifically said that he thought he used his clinical judgment to evaluate the criteria and reach a conclusion. That is effectively what this court affirmed in Wendell. There is no testimony I will concede that he specifically said, I gave 10% to XYZ factor or I gave 15% to ABC factor. But when you look at his report, it goes through the factors that would lead one to a conclusion of whether or not cancer or an agent is capable of causing cancer. That's exactly the type of work that was done in Wendell. And finally, with respect to the ASC post argument, I would just note the following. As this court knows, A, it's not a requirement in this circuit or in any circuit that you must publish your findings in order to be allowed to testify with Daubert. B, that article was written in the context of Cancer Awareness Month and was largely an editorial in a non-peer-reviewed, non-published, un-peer-reviewed scientific journal. It was basically an editorial. And finally, although not by name, he did specifically reference other anti-diabetic drugs. The bottom line is this. We read Wendell to say the following, a highly qualified expert using their clinical judgment and relying on limited peer-reviewed evidence is capable of testifying to a jury. Here, Dr. Gayle, by any measure, assuming that you agree that the biostatisticians and mechanism expert come in, had far more than what the doctors had in Gayle. And for those reasons, we would encourage the court to reverse the district court and remand on preemption in Daubert. And I'll reserve the final 245 for rebuttal. Thank you, counsel. Good morning, Your Honor. May it please the court, Alana Eisenstein. I represent the appellee, Nova Nordisk. I want to start where Mr. Becker left off on the Daubert issue, and then I will turn to preemption. What this court has said is required in Wendell, in Messick, and indeed most recently in Hardiman, is that an expert, particularly one who engages in what Dr. Gayle described as a weight of the evidence approach, must do two main things. He has to review in a way the totality of the relevant evidence, and he has to provide scientifically sound reasons for his opinion that would enable this court and other experts to decide whether the methodology was reasonable and whether it can be verified. It must be founded on more than subjective beliefs or unsupported speculation. That's from Messick. Dr. Gayle admitted he neither reviewed the totality of the evidence, far from it, and he provided no scientifically sound explanation, in fact, no explanation at all for what he weighed, how he weighed it, and why he weighed it. So let me start with the totality of the evidence and the failure of Dr. Gayle to review the evidence. Dr. Gayle acknowledged that he reviewed only a small subset of the available evidence, and none since 2015. You can't weigh what you don't review. And just talking about the post-2017 evidence for a minute, Mr. Becker's representation that this was class-wide evidence and not even liraglutide-specific is simply incorrect. There were numerous liraglutide-specific studies. LIDER was one of the primary ones, but also a large study called FUNCH, which found no causal association. And the FUNCH study involved seven times more patients than the studies considered by Madigan or Wells. But Gayle did not review it at all. And all of those studies that came out post-2015 confirmed the fact that there was no association between pancreatic cancer and liraglutide, or for that matter, in Cretins as a class. So the evidence was confirmatory and even stronger evidence than had existed before, and yet Dr. Gayle reviewed neither. He couldn't explain his And if you look at his 2019 report, it is amounts to the causation opinion is only three-quarters of a page, and according to the records, was prepared in one day. The 2015 report is not that much more extensive. While Mr. Gayle cites supposedly ten factors that were considered, almost all of those factors that were in the 2015 report are simply not relevant to the ultimate question. They're background-type facts about how pancreatic cancer develops or cancers in general. But on the core issue about whether or not there's a causal association between liraglutide and pancreatic cancer, it is very scanty, even in 2015. But in the absence of explanation, this opinion simply fails. I just want to quote to you, and this was cited in our brief, that Mr. Gayle, Dr. Gayle admitted that his conclusions could only be replicated by a clone of himself. He couldn't explain what he reviewed, and he couldn't explain how he weighed the evidence. So in a weight of the evidence analysis, what an expert typically does is they line up the studies, and they say, well, I gave this study weight because, and I discounted this study because. Dr. Gayle didn't do that in his report, and he didn't do it and said he couldn't do it in his deposition. The best plaintiffs could come up with at page 28 of the reply brief was that he doesn't have a definitive answer to the weight of the evidence. I just see which way the scales tilt. The absence of that explanation is particularly striking here, given the mountain of evidence on the other side. This isn't a case like Wendell, where there was a very rare disease. That was a disease with one in six million incidents in the general population. This is pancreatic cancer, and this particular issue, the specific link between incretins and pancreatic cancer and liraglutide and pancreatic cancer has been the subject of extensive study, hundreds of studies, both the kind of randomized controlled studies that experts generally think are the as well as observational studies, as well as animal studies. Over 18,000 animals have been looked at, none of whom have developed pancreatic cancer after being treated with liraglutide. Hundreds of peer-reviewed publications, not one of which has agreed with plaintiffs' litigation-specific experts, and all of those studies have found no evidence of a causal association. And, of course — So, do we exclude it now, or is this the kind of thing the jury should hear, that we've got these statisticians and Dr. Gale over here, he's the only person maybe in the country or the world that has this position, and then we have these other people. So you decide, do we accept or reject? You know, how do you draw the line here between what the jury should possibly see and hear the judge excluded it right up front? So, Your Honor, it's not about just the fact that Dr. Gale stands alone, although that's something that the Court could consider because it's right to put a red — that there's a red flag or an extra degree of skepticism when an expert is the only one that does — that stands for the particular proposition and that falls under the Daubert standard of general acceptance. But really, it's about methodology. And what this Court has insisted on is that there is some type of reasonable scientific methodology that is explained to justify the expert's opinion. It's not just a subjective litigation opinion that's because of an ipsa dixit, I said so. And that is exactly what we have here. This is one of those rare cases where the expert just falls really far outside the Daubert line. It is utterly unlike Wendell. If you line up the level of But if you line up the kind of articulation of reasons that the expert gave in Wendell, he not only explained his opinion — in that case, there was other scientific evidence to support his position in Wendell — that the drug at issue, 6-MP, showed an increased risk of this very rare leukemia. And also, it was a specific causation case where the expert applied the Bradford-Hill criteria, something that this Court has recognized as an established method of differential diagnosis, and found that it would be extremely unusual for a young man of that age with no other risk factors to develop the condition absent exposure to the particular drug. It does seem here that this time frame of — I think it's 2015 to 2019 — and not actually having any of that data examined, you know, could be potentially fatal. What do you make of Adam's explanation of why that's not important? Right. So, counsel explained two things, I believe. One was he said that none of it was liraglutide-specific, and that's simply incorrect. There's a long list of studies that were presented to the District Court that were either liraglutide-specific or that included liraglutide as part of observational studies, all of which came to a contrary conclusion to Gail, and Gail considered none of them. The other thing is, if you look at what Gail in his own report did rely on, he just adopted wholesale, blindly, the analyses of Madigan and Wells. And so I heard Mr. Becker say, well, you know, without Gail, the whole case falls. But Gail stands on a house of cards, and we've explained the numerous methodological flaws in the statistician's opinions that properly rendered those inadmissible. And they're really egregious, because Madigan and Wells, and this is really, if it boils down to it, the basis for Gail's opinion is just block quoting and adopting what Madigan and Wells did. Madigan and Wells took a series of studies, none of which showed a causal association, and this included LIDER, which was, of course, closely also examined by the FDA to approve a new indication, and for the purpose of its analysis here. It took, they took a series of studies, pulled apart the data, and then tried to add up the number of cancer events that were purportedly attributed to liraglutide against the number in the placebo. And they did it in a way that was biased, that was riddled with errors, that included, for example, events that were benign in the pathology, that counted two cancers against liraglutide that occurred before treatment had even happened. So that can't possibly be relevant to causal association. And they did it overall in an inconsistent way that skewed the results to try to find a causal association. And even with that, Madigan and Wells could do so only barely. If even one of those events were shifted from the liraglutide column to the placebo column, so that the entire statistical association or statistical significance disappears. So that is how sensitive that analysis was. And when you look at Madigan and Wells' explanations, they on the one hand both admit they're statisticians, not scientists. But on the other hand, they go deep into the science of trying to talk about pathology and the diagnosis and the different types of adjudication committees that were embedded in these studies. These are scientific determinations that Madigan and Wells were engaged in, yet utterly unqualified to do. And instead of reviewing or verifying that data, Dr. Gale admitted he did nothing to validate or verify. That is a fatal error as well, because that was really, when it comes down to it, one of the primary bases for Dr. Gale's opinion. Mr. Becker also talked about the peer review. There is no peer review requirement, but of And here, the fact that one year after his expert opinion, Dr. Gale published an extensive article. This is not a, this article actually amounts to a more extensive analysis than his expert report in this case, if you look at it. That article doesn't identify liraglutide or incretins as a cause of pancreatic cancer, although that's the subject of the article, causes of pancreatic cancer. Isn't this just a matter for cross-examination, that particular article? Your Honor, it's not because of the, you know, that particular issue combined with other methodological flaws underscores how unreliable Dr. Gale's opinion is, because in that article, he gave a diametrically opposed opinion. It wasn't just, there was, you know, suggestion he didn't address it at all. He said antidiabetics have no discernible effect or are controversial and require further study. Would one year before and three years later, he says it's more likely than not that IBTs cause pancreatic cancer. You just can't reconcile those things, and I think peer review and the willingness to publish your results is a factor, and it further contributes to the deficits of Gale's testimony. I want to move on and take a few minutes to talk about the preemption, if I may. So in this particular case, it's the lack of causal association, and we've discussed this. The lack of causal association means that plaintiffs fail as a matter of general causation, and the district court properly granted summary judgment on that basis. But it also means that this claim is preempted, and that's because Federal law prohibits manufacturers from adding an unsubstantiated warning. Mr. Becker conceded evidence of a causal association is required in the first instance to add a warning, to have a warning on a label, and it's required under the CBE regulations to have a new change for the manufacturer to change the label. That is the irreducible requirement of Federal labeling regulations, and it is absent here. So the absence of causal association itself demonstrates preemption. But I also want to talk about the absence of new information, because not only does there have to be an absence of causal association, but for a manufacturer to change the label after the FDA approves it, there needs to be something new, and that new evidence has to demonstrate causal association. Mr. Becker focused on what he described, what's called the Humedica study. This study was neither new nor provided evidence of a causal association. It was an effort to examine the background rate of patients who did not take Leraglutide. This was a study of electronic health records of a totally different, in a claim system, and the District Court found, contrary to Mr. Becker's claim that this was only about submission to the FDA, the District bearing on pancreatic safety of Leraglutide is limited, and there's good reason for that. The background rate is not evidence of causation, and their own experts, as well as our experts, admitted it's not suitable for comparison to clinical trials as Mr. Becker attempts to do here at Argument. It's a signal detection tool. It's used as a piece of context to evaluate adverse event reports, and FDA does not require, importantly, manufacturers to submit background rates and post-marketing surveillance. The claim that Humedica shows a doubling of pancreatic risk is an argument that's been advanced by Mr. Becker and plaintiff's counsel, not by their own experts. Dr. Madigan himself recognized the limitations with comparing incident rates in clinical trials, which was a leader, to incident rates in an observational study, which is Humedica. And the Humedica's own authors described the results as unreliable, and not establishing a viable background rate. The study authors showed that the methods they used, they described this themselves, they set out to do something, but then they realized the limitations of their own study. Under count of the pancreatic cancer rate, they, quote, were collected for the purpose of clinical management, not research, and, quote, they have no, there's no interpretation of the effect of lyric lutein, a malignancy that can be made on the current analysis. That's at ER 987. So the authors of the study itself refute the concept that this study could be used in the manner that plaintiffs suggest. So let me just make sure I understand your argument, because much of his argument on the Humedica study was that it wasn't really disclosed, it's on a website, and you have to click, click, click, click, click to get there, and that that's not really disclosure. Your argument's really focused on the substance of the study, as I understand it. Could you also address the disclosure issue? Certainly, Your Honor. On the disclosure issue, yes, it was on the clinicaltrials.gov website. Yes, it was publicly available. But in addition, in 2018, Novo Nordisk submitted a background range that was .01 to 2.5, 2.4, excuse me, per 100 patient years in their periodic safety update report, and that was based on a broader review of peer review literature. So they didn't submit the Humedica study, but they submitted a background range that went far below what Humedica showed. Let me just understand, it's on .gov, but is that, you're saying that therefore it's a disclosure to the FDA? Yes, I think it is a disclosure to the FDA, but it's also evidence that the FDA was well aware of and considered. So the other thing that the district court found is that the FDA conducted its own independent evaluation of the background range. It looked at the underlying studies and made reasonable conclusions as to what that was. But in addition, in 2018, Novo Nordisk submitted background rates as part of its periodic updates, so manufacturers have to update the FDA with relevant information. And as part of that, it chose to include the background rate of .01 to 2.4, the .01 range being well below the .029 per 100 years that was reflected in the Humedica study. So FDA had that range in front of it, and just a few miles in 2019. So that information, the substance of the information, if not the study, the actual Humedica study itself, was submitted to FDA in 2018, and the FDA did not find that justified a pancreatic cancer warning. And that brings me to the last point, and I do want to say one thing about burden of proof, if I may. The district court, and Mr. Becker made much of this in his reply brief and here today, the district court did not place the The district court referred four times to preemption as an affirmative defense. It notes the summary judgment standard has to be applied to affirmative defenses. And the court methodically evaluated each piece of evidence the plaintiff cited as newly acquired evidence and found no genuine issue of fact that it could meet the regulatory standard for newly acquired evidence. There was no issue about burden of proof here. I want to just say, take my last remaining minute to just talk about the FDA's actions here, because I think they are significant, particularly in light of the multiple indications that have been approved since 2014. Mr. Becker talked about the citizen's petition. The citizen's petition is clearly a legal action by the FDA with the force of law. It is governed by regulation, which is 21 CFR 10.30B3. The standard is the same for label approvals regardless of who approves that. And Mr. Becker's claim that this wasn't about warnings is simply incorrect. Take a look at 1 SCR 87 and 98. In both of those places, the FDA's letter rejecting the citizen's petition specifically addresses one of the claims of the citizen's warning and rejects it, having done a comprehensive evaluation of this issue in 2014, which it published in the New England Journal of Medicine, and continuing to focus intensely on this issue. And I think that's one of the distinguishing features here. FDA focused on this issue for over a decade. It engaged in a comprehensive analysis of this very risk, unlike in those cases where it had not focused on this issue. It engaged in a comprehensive analysis and yet found that no warning label was required. And unlike in both of those cases, Wyeth and Albrecht, where a label was ultimately required on the risk at issue, here no drug in this class has a warning label. Your Honors, we ask that you affirm the summary judgment on both general causation and Federal preemption grounds. Thank you, Counsel. We'll hear a rebuttal. Thank you. Let me start with preemption and then move to Dr. Gale. First, we know that the incidence rate is relevant because in 2018, before the advisory committee, Novo told FDA that the reported event rate for the Liragutai group, this is from Leader, was 0.08 events per 100 year, is, quote, within the predicted range as may be expected for the background of type 2 diabetic population. The problem with Counsel's argument is this. At the time that Novo made that argument, it had the Humedica study, which evidenced an incidence rate that was 0.03. So, in other words, the background rate for type 2 diabetics of anticipated users is not within the predicted range as they experienced in Leader. That's And despite Counsel's argument to the contrary, if you go to clinicaltrials.gov, it says in big black letters, study not available. The only way you can find that study is if you know it actually got conducted, got published, got written, and had the way to get to Novo's website and navigate through it to find the study. That is not fully informed. The secondary problem with Counsel's argument is this. The burden of proof is on the defendant to establish that the Humedica study was not evidence of some basis of a causal relationship. There is no expert testimony offered by Novo in this case. There is no testimony by them or any evidence in the record to suggest that the Humedica study evidencing a significantly lower incidence rates than what they experienced in Leader is not a potential sign of causation. Because there is no evidence, they cannot carry their burden of proof and they cannot maintain the affirmative defense. Turning to Dr. Gale, let me just kind of end where we started. Ultimately, Dr. Gale had the following at his disposal. He had reports from biostatisticians that showed a doubling of the hazard ratio. He had Leader, which showed a doubling of the hazard ratio. He had a mechanism, a viable mechanism from Dr. Brown, which showed a pathway from ingestion to cancer. He has 50 years of practice as an oncologist and specifically testified that he used the same approach he does in his daily practice. That's an ER-168. Given the reference manual allows for this type of wane of the evidence, that work that he conducted and reviewed clearly exceeds that which was present in Wendell. And that is the reason why he should be allowed to testify. So we would ask that this court reverse the district court's conclusion on preemption and allow the experts to testify. Thank you, Your Honor. Thank you, counsel. Thank both of you for your arguments this morning. The case just argued will be submitted for decision and will be in recess for the morning. All rise.
judges: THOMAS, McKEOWN, Orrick